**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

|                                 |   |                              |
|---------------------------------|---|------------------------------|
| RICHARD WAYNE DAVIS, JR.,       | ) |                              |
|                                 | ) |                              |
| Plaintiff,                      | ) |                              |
|                                 | ) |                              |
| v.                              | ) | C.A. No.  16-625-LPS-MPT     |
|                                 | ) |                              |
| CAROLYN W. COLVIN,              | ) |                              |
| ACTING COMMISSIONER OF          | ) |                              |
| SOCIAL SECURITY,                | ) |                              |
|                                 | ) |                              |
| Defendant.                      | ) |                              |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This action arises from the denial of plaintiff's claim for Social Security benefits.[1]

On August 28, 2012, plaintiff filed a Title II application for Social Security Disability

Insurance Benefits, alleging disability beginning August 23, 2012, due to his

degenerative disc disease, cervical spondylosis, persistent headaches, occipital

neuralgia, depression, adjustment disorder, and posttraumatic stress disorder

("PTSD").[2]  The claims were denied initially on November 27, 2012, and upon

reconsideration on May 20, 2013.[3]  Following these denials, plaintiff requested a

hearing before an Administrative Law Judge ("ALJ") and the hearing occurred on July

16, 2014.[4]  At the hearing, testimony was provided by plaintiff and an impartial

---

[1] D.I. 12 at 1.
[2] *Id.*; D.I. 1 at 1.
[3] D.I. 12 at 1.
[4] *Id.*

vocational expert, Christina Cody.[5] On October 10, 2014, the ALJ, Jack Penca, issued

a written decision denying his claims.[6] Plaintiff requested a review of the ALJ's decision

by the Social Security Appeals Council, which was denied on May 23, 2016.[7] On July

22, 2016, he filed a timely appeal with the court.[8] Presently before the court are the

parties' cross-motions for summary judgment.[9] For the reasons that follow, the court

will grant the Defendant's motion.

## II.    BACKGROUND

Plaintiff was born on July 23,1968 and was forty-four years old at the onset of his

alleged disability.[10] He has a high school education and past relevant work as a

locksmith, HVAC technician, alarm investigator, and automotive mechanic.[11] His

alleged disability dates from August 23, 2012.[12] Plaintiff sustained spinal injuries while

serving in the military in Iraq.[13] He returned from Iraq in May 2007 and left active duty

service in November 2010.[14] Plaintiff has since been diagnosed with PTSD, adjustment

disorder with depression and anxiety related to his PTSD.[15] He was first treated at the

VA before returning to his original job as a locksmith.[16] He remained employed for

approximately three months before he was released from his job because of how

---

[5] *Id. See also* D.I. 6-5 at 206.
[6] D.I. 12 at 1.
[7] *Id.*
[8] *See generally* D.I. 1.
[9] *See generally* D.I. 11; D.I. 15.
[10] D.I. 12 at 2; D.I. 6-5 at 213.
[11] *Id.* at 2.
[12] D.I. 6-5 at 186.
[13] *Id.* at 188. *See also* D.I. 6-10 at 450.
[14] D.I. 6-5 at 215.
[15] *Id. See also* D.I. 6-10 at 451.
[16] D.I. 6-5 at 216.

frequently he lost consciousness.[17]  After being released from his employment as a locksmith, plaintiff's friend hired him as a console operator, monitoring security at JP Morgan.[18]  While at JP Morgan, he was permitted to take at least two hour-long breaks per day and take approximately four to seven absences per month.[19]  In August 2012, he stopped working at the recommendation of his psychiatrist, Dr. August.[20]  Despite his prior vocational experience, plaintiff claims he remains disabled under the Act.[21]  To be eligible, plaintiff must demonstrate he is disabled within the meaning of §§ 216(i) and 223(d) of the Social Security Act (the "Act").[22]

### A.    Evidence Presented

#### 1.    Physical Impairments

Plaintiff was injured while he was deployed in Iraq as part of Operation Iraqi Freedom in 2006.[23]  When his helicopter came under fire, plaintiff was forced to jump out of the helicopter while carrying approximately 300 lbs of gear.[24]  When he landed on the tarmac, two feet below, he "felt a searing pain and a wet sensation in his back."[25]  Subsequent medical exams revealed a T9 compression fracture and degenerative changes.[26]

In March 2010, an MRI of plaintiff's lumbar spine showed mild degenerative disc

---

[17] *Id.*
[18] *Id.* at 216-17.
[19] *Id.* at 217-18.
[20] *Id.* at 218.  *See also* D.I. 6-10 at 471.
[21] *See generally* D.I. 1.
[22] D.I. 6-5 at 186.  *See also* 42 U.S.C.A. §§ 416, 423.
[23] D.I. 6-10 at 450.
[24] *Id.*
[25] *Id.*
[26] *Id* at 445-451.

disease.[27]  In April 2013, an MRI of plaintiff's cervical spine demonstrated multilevel spondylitic changes.[28]  A subsequent CT scan showed cervical spondylosis.[29]  A more recent MRI conducted in January 2014 demonstrated a heterogeneous disc osteophyte complex, causing a "mild spinal stenosis and mild to moderate bilateral foraminal stenosis" and small disc osteophyte complex causing "moderate left foraminal stenosis."[30]  Clinical examinations found resulting decreased range of motion in the cervical and lumbar spine and an occasional abnormal gait.[31]

Plaintiff first underwent examinations of his vision in October 2012 to investigate complaints of occipital nerve damage, and these examinations showed no abnormalities.[32]  By April 2013, plaintiff's symptoms were well-managed with periodic injections and a nerve block.[33]  Plaintiff did not report any problems or symptoms related to occipital neuralgia until January 2014.[34]  At that point, he received an injection with favorable results.[35]  Plaintiff has since ceased receiving these injections because he claims they make him sick.[36]

Finally, plaintiff alleges he has a heart condition which causes shortness of breath and fatigue.[37]  However, a June 2012 pulmonary function study was within

---

[27] D.I. 6-15 at 816.
[28] D.I. 6-11 at 535-36.
[29] D.I. 6-13 at 725-35.
[30] D.I. 6-18 at 1127-28.
[31] D.I. 6-5 at 188.
[32] *Id.* at 189.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.* at 222.
[37] *Id.* at 189-190, 221.

normal limits.[38]  Physical examinations throughout the relevant period exhibit normal

heart and lung function.[39]  A chest xray conducted in January 2013 was

"unremarkable."[40]

## 2. Psychiatric Impairments

On July 19, 2012, plaintiff was evaluated at the Veterans Affairs Medical Center

("VAMC") after complaining of difficulties performing his job duties due to poor

concentration, forgetfulness, and controlling his anger.[41]  Plaintiff was diagnosed with

PTSD by Dr. David August, D.O., who increased plaintiff's dose of Nortriptyline.[42]  In

August 2012, Dr. August substituted Abilify for Nortriptyline because plaintiff noted

increased anger.[43]  At the end of that month, plaintiff denied depression and reported no

homicidal thoughts or suicidal ideation.[44]

In October 2012, plaintiff stated he was not feeling as depressed and reported no

recent problems controlling his anger.[45]  During that same month, plaintiff was evaluated

by Madeline Babette Jenny, Psy.D., who reaffirmed plaintiff met the criteria for PTSD

and also diagnosed adjustment disorder.[46]  During his meeting with Dr. Jenny, he stated

his inability to remember and concentrate prevented continued employment.[47]  Plaintiff

also saw Greg Victor Tampus, M.D., in October 2012, and denied being hospitalized or

---

[38] *Id.* at 189.
[39] *Id.* at 189-190.
[40] *Id.* at 190.
[41] D.I. 12 at 2.
[42] *Id.* at 2-3.
[43] D.I. 12 at 3.
[44] D.I. 16 at 4.
[45] D.I. 12 at 3.
[46] *Id.*
[47] D.I. 16 at 5.

needing urgent care for psychological issues.[48]  Plaintiff also stated his unemployment was "not due, primarily, to the effects of a mental condition."[49]  In November 2012, plaintiff met with his first state agency psychologist, Dianne Bingham, Ph.D., who found he could perform simple, routine work.[50]

In January 2013, Dr. August noted no significant changes in plaintiff's psychiatric condition.[51]  Jennifer Tedesco, Psy.D. evaluated plaintiff the next month and similarly diagnosed PTSD.[52]  In April 2013, plaintiff reported continued problems with anger.[53]  He underwent group therapy over the next two months.[54]  Randal Miller, M.D. evaluated plaintiff in May 2013, and noted that plaintiff had a 90 percent combined disability rating from the VA and diagnosed chronic PTSD, adjustment disorder with depression and anxiety related to PTSD, cervical disc disease, thoracic compression fracture, and left occipital neuralgia.[55]  Dr. Miller stated plaintiff suffered from occupational and social impairment in addition to reduced reliability and productivity.[56]  This same month, plaintiff met his second state agency psychologist, Christopher King, Psy.D., who reiterated Dr. Bingham's assessment that plaintiff could perform simple, routine work.[57]  In August 2013, Susan Bailey, CRNP, observed that plaintiff was cooperative and able

---

[48] *Id.* at 4.
[49] D.I. 6-10 at 499.
[50] D.I. 16 at 7.
[51] D.I. 12 at 4.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*; *see also* D.I. 16 at 6.
[57] D.I. 16 at 7; *see also* D.I. 6-10 at 512.

to relate his history and symptoms in a detailed manner.[58]  In October 2013, Dr. August noted he was improving with counseling without any medications.[59]  Plaintiff's VA rating was updated in December 2013:  70 percent service connected disability rating for PTSD and a permanent 100 percent disability.[60]

In January 2014, plaintiff followed up with Dr. August, relating he felt depressed and continued to struggle with anger.[61]  Dr. August completed a Psychiatric/Psychological Impairment Questionnaire, in which he diagnosed PTSD and noted the following symptoms:  poor memory, appetite disturbance, sleep disturbance, personality change, mood disturbance, recurrent panic attacks, psychomotor agitation, difficulty thinking or concentrating, social withdrawal or isolation, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and hostility.[62]  Dr. August opined the limitations reflected in the questionnaire were present since August 2012, and plaintiff would be incapable of performing even a low-stress job.[63]

**B.    Hearing Testimony**

**1.    Plaintiff's Testimony**

At the July 16, 2014 hearing, plaintiff testified about his background, work history, and his alleged disability.[64]  He is married and lives with his wife, who is his primary

---

[58] D.I. 16 at 6.
[59] *Id.*
[60] D.I. 12 at 5.
[61] *Id.*; *see also* D.I. 6-16 at 930.
[62] D.I. 12 at 5.
[63] *Id.*; D.I. 16 at 7.
[64] *See generally* D.I. 6-5 at 208-48.

caregiver.[65]  His wife reminds him of appointments and chores, completes household chores that are too demanding for him, takes him to his appointments, and drives the majority of the time.[66]  Plaintiff has not worked since August 2012.[67]

Plaintiff served in the military and was deployed in 2006 to Camp Togy in Iraq.[68] He returned from Iraq in May 2007 and left active duty service in November 2010.[69] Plaintiff stated he was treated at the VA for a few months before returning to his original job as a locksmith.  His employer released him from that job because he was "a liability" and plaintiff opined his employer was concerned about his frequent loss of consciousness and consequent safety concerns.[70]  Plaintiff estimated he lost consciousness three times per month, which has decreased to once per month in recent months.[71]

Upon being released from his locksmith job, he was employed by his friend at JP Morgan as a console operator, monitoring security systems.[72]  He worked there for approximately five years until 2012 per Dr. August's recommendation to stop working.[73] While employed as a console operator, plaintiff was allowed extended breaks or to go home.[74]  Because he was the only console operator, plaintiff needed to be relieved by

---

[65] *Id.* at 225.
[66] *Id.*, 230-31.
[67] *Id.* at 218.
[68] *Id.* at 213.
[69] *Id.* at 215.
[70] *Id.* at 215-16.
[71] *Id.* at 216.
[72] *Id.* at 216-17.
[73] *Id.* at 216, 218.
[74] *Id.* at 217.

his supervisor.[75]  Plaintiff estimates he was permitted approximately two hour-long breaks per day and was absent from his job four to seven times per month.[76]

Plaintiff also noted he worked for the National Guard for a few years after returning from Iraq.[77]  He worked as an automotive mechanic, but his injuries made conducting those job responsibilities difficult.[78]  His job responsibilities evolved to supervising other soldiers.[79]

Concerning his daily activities, plaintiff testified he tries to drive short distances, complete household chores that do not require heavy lifting or bending down (such as dusting and vacuuming), and care for his pets.[80]  Plaintiff related he prefers to watch action programs on television because he is unable to concentrate and comprehend dramas as before.[81]

Plaintiff described how his symptoms restricted his ability to work.[82]  Because of persistent headaches, degenerative disc disease, occipital neuralgia, and PTSD symptoms, he is unable to perform his previous employment duties.[83]  He states he suffers from headaches occur at least three times per day.[84]  If medication does not alleviate the pain, he needs to lie down to rest.[85]  Plaintiff testified he often experiences

---

[75] *Id.* at 233.
[76] *Id.* at 217-18.
[77] *Id.* at 236.
[78] *Id.*
[79] *Id.* at 236-37.
[80] *Id.* at 229-231, 239.
[81] *Id.* at 231, 235-36.
[82] *Id.* at 215-16, 219-228.
[83] *Id.* at 219-228.
[84] *Id.* at 219
[85] *Id.*

numbness in his hands and feet, which interferes with manipulation of his fingers.[86]  His

occipital neuralgia blurs vision in his left eye.[87]  His PTSD symptoms include

nervousness around crowds, panic attacks, a feeling of powerlessness, irritability, mood

swings, difficulty concentrating, short term memory loss, and violent verbal outbursts.[88]

Plaintiff also related past suicidal ideations.[89]

He can walk approximately one mile.[90]  He is able to stand for one hour, but

needs to be seated for another hour before standing again.[91]  He can remain seated for

approximately one hour.[92]  Plaintiff is able to lay down for approximately two to three

hours before being awoken by pain.[93]

Regarding treatment, plaintiff related he is to begin physical therapy for his neck

pain, and may need another surgery on his spine, should the physical therapy prove

unsuccessful.[94]  He takes medicine for his headaches, which has been met with mixed

results.[95]  He used to receive trigger point injections to address the pain from his

occipital neuralgia, but adverse side effects forced him to stop.[96]

## 2. Vocational Expert's Testimony

The vocational expert, Christina Cody, testified about plaintiff's background,

---

[86] *Id.* at 220.
[87] *Id.* at 221-22.
[88] *Id.* at 222-26.
[89] *Id.* at 224.
[90] *Id.* at 228.
[91] *Id.* at 226.
[92] *Id.*
[93] *Id.* at 227.
[94] *Id.* at 234.
[95] *Id.* at 219.
[96] *Id.* at 222.

skills, and limitations, and the jobs available within his restrictions.[97]  Cody classified

plaintiff's work as a locksmith and alarm investigator as light exertion employment and

his work as a HVAC technician and automotive mechanic as medium exertion jobs.[98]

During the hearing, the ALJ and Matthew File, plaintiff's attorney, posed several

hypothetical situations.[99]  All were based on a hypothetical individual of "plaintiff's age,

education, and work history."[100]

In the first hypothetical, the individual could work at the medium exertion level

and could "frequently climb ramps, stairs, ladders, ropes, and scaffolds," frequently

balance, stoop, kneel, crouch, and crawl, [] . . . have frequent exposure to extreme cold

and vibration [and] . . . perform simple, routine, and repetitive tasks with no fast pace or

strict production requirements."[101]  In response, Cody testified plaintiff's past work would

not conform to the hypothetical.[102]  Additionally, she testified three medium level

exertion positions would fit the hypothetical:  hand packager, order picker, and

equipment cleaner.[103]

The second hypothetical included the same restrictions as the first, with the

individual limited to work at the light exertion level.[104]  Cody testified three jobs fit the

hypothetical:  inserter, hand bander, and assembler.[105]

---

[97] *Id.* at 240-48.
[98] *Id.* at 241.
[99] *Id.* at 241-48.
[100] *Id.* at 241.
[101] *Id.* at 242.
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id.* at 243.

The third hypothetical conformed to the same limitations as the second hypothetical, with the additional restriction of no more than frequent exposure to "heat, wetness, humidity, fumes, odors, dusts, gas, poor ventilation, and hazards such as moving machinery and unprotected heights."[106]  Cody responded that the same positions previously mentioned for the second hypothetical remained feasible.[107]

The fourth hypothetical included the same limitations in the third hypothetical, but the individual was limited to sedentary work.[108]  Cody testified three jobs fit this hypothetical:  type copy examiner, table worker, and bench hand.[109]

In the fifth hypothetical, the individual was constrained to the limitations in the third hypothetical, but the individual could only have occasional interaction with coworkers and the public.[110]  Cody concluded the positions mentioned previously - inserter, assembler, and hand bander - were feasible.[111]

In the ALJ's sixth and final hypothetical, the individual was limited in his ability to sit, stand, and walk to less than two hours, would have to take up to five or six unscheduled breaks per day, and would miss work three or more days per month.[112]  Cody concluded that these limitations, especially in combination, would be work-preclusive.[113]

Plaintiff's attorney then posed several hypothetical scenarios to the vocational

---

[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.* at 244.
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.* at 245.

expert.[114]  He defined "moderately limited" as "significantly affects but does not totally preclude the individual's ability to perform that activity" and "markedly limited" as "effectively precludes the individual from performing the activity in a meaningful manner."[115]

In counsel's first hypothetical, the individual is markedly limited in the ability to remember locations and work procedures.[116]  Cody testified that such limitation would be work-preclusive.[117]

In the second hypothetical, the individual is markedly limited in the ability to understand or remember one or two step instructions.[118]  Cody testified that such an individual would not be employable.[119]

Counsel's third hypothetical presented an individual who is moderately limited in the ability to understand and remember one or two step instructions.[120]  Cody testified that if the limitation was "to cause a reduction in productivity of 15 to 20 percent or more then it would be work-preclusive."[121]

The fourth hypothetical concerned an individual who is markedly limited in the ability to maintain attention and concentration for extended periods.[122]  Cody testified such an individual would not be employable.[123]

---

[114] *Id.* at 245-48.
[115] *Id.* at 245.
[116] *Id.* at 245-46.
[117] *Id.* at 246.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*

In the fifth hypothetical, the individual was markedly limited in the ability to sustain an ordinary, routine without supervision.[124]  Cody testified such an individual was unemployable.[125]

In the sixth hypothetical, the limitation that individual had to keep his head in a stationary position was added.[126]  Cody concluded none of the jobs identified in response to the ALJ's hypothetical scenarios would be appropriate.[127]

In the final hypothetical, the individual suffered a loss of manual dexterity, the ability to grasp and turn objects, and fine finger manipulation for up to one third of the day.[128]  Cody testified that if this limitation is combined with "a reduction in productivity of 15 to 20 percent or more then it would be work-preclusive."[129]

### 3.  The ALJ's Findings

Based on the medical evidence and testimony, the ALJ determined plaintiff was not disabled and, therefore, ineligible for Social Secuirty Disability Insurance.[130]  The ALJ's findings are summarized as follows:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
>
> 2.  The claimant has not engaged in substantial gainful activity since August 23, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

---

[124] *Id* at 246-47.
[125] *Id.* at 247.
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] *Id.*
[130] *See generally* D.I. 6-5 at 186-200.

3. The claimant has the following severe impairments: degenerative disc disease; cervical spondylosis; depression; and posttraumatic stress disorder (PTSD) (20 CRF 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except that he could frequently climb ramps, stairs, ladders, ropes, and scaffolds, frequently balance, stoop, kneel, crouch, and crawl, frequently be exposed to extreme cold and vibration, and could perform simple, routine, repetitive tasks with no fast pace or strict production requirements.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 23, 1968, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from August 23, 2012, through the date of this decision (20 CFR 404.1520(g)).[131]

## III. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Both parties move for summary judgment. In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[132] If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[133]

This standard does not change merely because there are cross-motions for summary judgment.[134] Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[135]

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[136]

---

[131] D.I. 6-5 at 188-200.
[132] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).
[133] *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).
[134] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).
[135] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[136] *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

**B. Review of the ALJ's Findings**

Section 405(g) sets forth the standard of review of an ALJ's decision. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not contain substantial evidence to support the decision. Factual findings are upheld if supported by substantial evidence.[137] Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence.[138] As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[139]

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the decision nor re-weigh the evidence of record.[140] The court's review is limited to the evidence that was actually presented to the ALJ.[141] The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion.[142]

Thus, the inquiry is not whether the court would have made the same determination, but

---

[137] *See* 42 U.S.C. §§405(g); *see also Monsour Med. Ctr. v. Heckle*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[138] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).
[139] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).
[140] *Monsour*, 806 F.2d at 1190.
[141] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).
[142] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

rather, whether the Commissioner's conclusion was reasonable.[143]  Even if the court would have decided the case differently, it must defer to and affirm the ALJ so long as the decision is supported by substantial evidence.[144]

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision."[145]  In *SEC v. Chenery Corp.*, the Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."[146]  "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[147]  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[148]  This court's review is limited to the four corners of the ALJ's decision.[149]  In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to FED. R. CIV. P. 56.[150]

---

[143] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).
[144] *Monsour*, 806 F.2d at 1190-91.
[145] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).
[146] 332 U.S. 194, 196 (1947).
[147] *Id.*
[148] *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001).
[149] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).
[150] *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

### A. Parties' Contentions

In his appeal, plaintiff contends the ALJ improperly afforded great weight to the non-examining physicians' opinions, while affording little weight to the opinions of his treating physician, Dr. August.[151]  Further, plaintiff argues the ALJ failed to adequately consider his VA disability rating.[152]  Plaintiff avers the ALJ also failed to properly evaluate his credibility.[153]

The Commissioner counters that the ALJ afforded proper weight to the  medical evidence of record, the different standards between Social Security and the VA supports the ALJ's weighing of the VA disability rating, and substantial evidence supports the ALJ's credibility analysis.[154]

### B. Disability Analysis

Title II of the Act, 42 U.S.C. § 423(a)(I)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[155]  To qualify for disability insurance benefits, a claimant must establish disability prior to the date he was last insured.[156]  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has

---

[151] D.I. 12 at 1.
[152] *Id.*
[153] *Id.*
[154] D.I. 16 at 1-2.
[155] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).
[156] *See* 20 C.F.R. § 404.131.

lasted or can be expected to last for a continuous period of at least 12 months.[157]  To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[158]

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[159]  If a finding of disability or non-disability can be made at any point in the sequential process, the review ends.[160]  At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity, and if so, a finding of non-disabled is required.[161]  If the claimant is not so engaged, step two requires the Commissioner to determine whether the claimant is suffering from an impairment or a combination of impairments that is severe.  If no severe impairment or a combination thereof exists, a finding of non-disabled is required.[162]

If the claimant's impairments are severe, the Commissioner, at step three, compares them to a list of impairments ("the listings") that are presumed severe enough to preclude any gainful work.[163]  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[164]  If a

---

[157] 42 U.S.C. §§ 423(d)(I)(A), 1382(c)(a)(3).
[158] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).
[159] 20 C.F.R § 404.1520.  *See also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).
[160] 20 C.F.R. § 404.1520(a)(4).
[161] 20 C.F.R. § 404.1520(a)(4)(I).
[162] 20 C.F.R. § 404.1520(a)(4)(ii).
[163] 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428.
[164] 20 C.F.R. § 404.1520(a)(4)(iii).

claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five.[165]  At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work.[166]  A claimant's RFC is "that which an individual is still able to do despite limitations caused by [his] impairment(s)."[167]  "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work."[168]

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude adjusting to any other available work.[169]  At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience, and RFC before denying disability benefits.[170]  In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments and often seeks the assistance of a vocational expert.[171]

### 1.    Weight Accorded to Opinion Evidence

Plaintiff asserts the ALJ erred by affording little weight to Dr. August's opinion, while giving substantial weight to the opinion of non-examining medical consultants.[172] A cardinal principle guiding disability eligibility determinations is that the ALJ accord

---

[165] 20 C.F.R. § 404.1520(e).
[166] 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428.
[167] *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001).
[168] *Plummer*, 186 F.3d at 428.
[169] 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 427-28.
[170] *Plummer*, 186 F.3d at 427-28.
[171] *Id.*
[172] D.I. 12 at 9-15.

treating physicians' reports great weight, especially "when the opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."[173]  Such reports will be afforded controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is consistent with the other substantial evidence on record.[174]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[175]  It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record.[176]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[177]  Further, medical testimony from a doctor who has never examined the claimant should not be given credit if it contradicts the testimony of the claimant's treating physician.[178]

If the ALJ does not give a physician's report controlling weight, he must examine multiple factors.[179]  These factors include the "[e]xamining relationship," the "[t]reatment relationship" which considers the "[l]ength of the treatment relationship and the

---

[173] *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000).
[174] *Fargnoli*, 247 F.3d at 43.
[175] *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429).
[176] SSR 96-2p, 1996 WL 374188 at *2.
[177] *Plummer*, 186 F.3d at 429.
[178] *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986).
[179] 20 C.F.R. §404.1527(c).

frequency of examination," the "[n]ature and extent of the treatment relationship," the degree and extent the relevant evidence supports a treating physician's opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating physician in relation to the medical issues involved.[180]  An ALJ must weigh all the evidence in the record.[181]  Failure of an ALJ to examine and elaborate on these factors is grounds for remand.[182]

Plaintiff argues the ALJ erred in affording Dr. August's opinion little weight by "cherry-picking" unfavorable progress notes from the medical record, relying on the opinions of non-examining physicians, and by using medically outdated GAF scores to reach a conclusion.[183]

The ALJ properly assigned little weight to Dr. August's opinion because it is inconsistent with VA mental health outpatient clinic notes.[184]  Pursuant to CFR § 404.1527(c)(1)-(5), the ALJ considered all relevant factors in determining how much weight to give to Dr. August's opinion.[185]  Specifically, the ALJ explained why Dr. August's opinion concerning plaintiff's mental status is inconsistent with the holistic record.[186]  The ALJ notes, for example, that a January 7, 2014 Psychological/Psychiatric Impairment Questionnaire is inconsistent with how plaintiff presented himself at earlier

---

[180] *Id.*
[181] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).
[182] *Solomon v. Colvin*, C.A. No. 12-1406-RGA-MPT, 2013 WL 5720302, at *12 (D. Del. Oct. 22, 2013).
[183] *See* D.I. 12 at 11-14.
[184] D.I. 6-5 at 197.
[185] *See* D.I. 6-5 at 193-97.
[186] D.I. 6-5 at 197.

and subsequent appointments, as well as the GAF scores of 60 or higher.[187]  The ALJ

cites this inconsistency between these opinions, and more importantly, the record as a

whole, as his reason for affording Dr. August's opinion little weight.

Plaintiff also asserts the ALJ erred by giving "significant weight to the opinions

from non-examining state agency psychologists."[188]  Although the ALJ gave significant

weight to the opinions regarding plaintiff's mental functioning limitations, the ALJ

supports his decision by stating that the "VA mental health outpatient clinic notes

support a reasonable basis for these limitations."[189]  Furthermore, the ALJ found the

same physicians opinions relating to plaintiff's residual functional capacity to be

deficient, evidencing a careful consideration of the evidence before him.[190]

The ALJ properly afforded controlling weight to Dr. Mills's opinion.  The ALJ

explained that because Dr. Mills's opinion is "well supported by his treatment notes" and

because his opinion is not "inconsistent with the other substantial evidence of record

showing claimant's positive response to treatment and the physical examination findings

[sic]," he afforded it controlling weight.[191]  Additionally, Dr. Mills initially evaluated plaintiff

_____

[187] *Id.* at 197-98 (Dr. August indicated marked limitations in mental functioning in
January 2015 with an average GAF score of 65, while Dr. Tedesco, another treating
physician, assessed plaintiff's memory, concentration, and attention as normal in
February and May 2013.).
[188] D.I. 12 at 11.
[189] D.I. 6-5 at 198.
[190] *Id.* ("[C]onsidering the clinical examination and objective studies, the normal
neurological findings, the claimant's course of treatment, and extensive daily activities,
together with the claimant's documented improvement with treatment, I find that the
claimant's [RFC] is greater than what was assessed by the State agency medical
consultants.").
[191] D.I. 6-5 at 197; *see* D.I. 6-18 at 1107-28.

and is a "treating specialist in neurosurgery."[192]

Therefore, the ALJ properly considered the medical evidence before him in accordance with CFR § 404.1527(c).

## 2.     VA Disability Rating Consideration

In December 2013, the VA found plaintiff had a 70 percent service connected disability rating for PTSD and a permanent 100 percent disability.[193]  Plaintiff contends the ALJ erred by not adequately considering the disability determination by the VA.[194]

A determination made by another governmental agency that an individual is disabled or not disabled is not binding on the Commissioner.[195]  The Third Circuit, however, recognizes that VA disability determinations are "entitled to substantial weight."[196]

A bare conclusion that the Social Security Administration ("SSA") and the VA have differing standards for disability is insufficient reasoning to support an ALJ's attribution of little weight to the determination by the VA.[197]  Plaintiff argues the ALJ did not adequately provide the reasoning for his decision to give little weight to the VA's Disability Rating.[198]  The ALJ, however, sufficiently explained that the weight attributed was based on the differing standards between the SSA and VA and that VA determinations are non-binding.[199]  The ALJ's reasoning did not end there; he further

---

[192] *Id.* at 195, 197; *see generally* D.I. 6-18 at 1107-28.
[193] D.I. 12 at 5.
[194] *Id.* at 9-15.
[195] 20 C.F.R. § 404.1504.
[196] *Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985).
[197] *Solomon*, 2013 WL 5720302, at *16.
[198] D.I. 12 at 15-16.
[199] D.I. 6-5 at 198.

explained evidence used in determinating disability under SSA standards was not considered by the VA in making its finding.[200]  Therefore, the ALJ properly considered the VA disability rating.

### 3.    Credibility Assessment

Plaintiff argues the ALJ erred in evaluating the credibility of his subjective complaints.[201]  The ALJ must follow a two-step process for evaluating symptoms.[202]  First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment . . .  that could reasonably be expected to produce the individual's pain or other symptoms."[203]  Second, the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do  basic work activities."[204]  Under this evaluation, a variety of factors are considered, such as:  (1) "objective medical evidence," (2) "daily activities," (3) "location, duration, frequency, and intensity," (4) "type, dosage, effectiveness, and side effects of any medication," (5) treatment (other than medication), (6) and "other factors" concerning plaintiff's limitations.[205]

In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence depends on their credibility.[206]  When evaluating a claimant's credibility, the ALJ must consider the entire case record and give specific

---

[200] *Id.*
[201] D.I. 12 at 12 at 16-17.
[202] SSR 96-7p (S.S.A.); 1996 WL 374186, at *2.
[203] *Id.*
[204] *Id.*
[205] 20 C.F.R. § 404.1529(c).
[206] SSR 96-7p, at *4.

reasons for the weight given to the individual's statements.[207]  A strong indication of

credibility is the consistency of an individual's own statements, with other information in

the record.[208]  Additionally, an individual's statements may be less credible if the record

shows the individual did not follow the treatment as prescribed.[209]  In making a finding

about the credibility of a claimant's statements, the adjudicator need not totally accept

or reject them, and may find some statements to be partially credible.[210]  Moreover,

"[o]verturning an ALJ's credibility determination is an 'extraordinary step,' as credibility

determinations are entitled to a great deal of deference."[211]

In his decision, the ALJ spends three full pages explaining why he found plaintiff

to not be credible.[212]  Specifically, the ALJ found plaintiff's statements regarding the

persistence, intensity, and limited effects of his symptoms not entirely tenable.[213]

The ALJ points to a laundry list of various examples as to why he did not find

plaintiff to be completely believable.  For example, concerning plaintiff's reported

diminished memory and ability to concentrate, the ALJ noted that Drs. Tedesco and

Tampus found no serious impairment in plaintiff's memory, and both stated he had a

normal ability to concentrate.[214]  Although Dr. Miller found plaintiff had a diminished

short-term memory, his report confirmed plaintiff had an overall mental status of

---

[207] *Id.*
[208] *Id.* at *5.
[209] *Id.* at *7.
[210] *Id.* at *4.
[211] *Metz v. Fed. Mine Safety and Health Review Comm'n*, 532 F. App'x 309, 312 (3d Cir. 2013).
[212] *See* D.I. 6-5 at 193-96.
[213] D.I. 6-5 at 193.
[214] *Id.* at 194.

normal.[215]  Furthermore, the ALJ found plaintiff's ability to play video games "all the time" suggested a higher ability to focus than plaintiff represented.[216]

The ALJ also stated plaintiff's failed adherence to his prescribed medical regimen also contributed to his finding of credibility.  The ALJ noted plaintiff complained of dizziness from Abilify, but sought no further treatment or change in prescription to combat the side effect.[217]  He noted that plaintiff did not take prescribed medications, such as Prednisone, and "rarely" used medications such as Hydrocodone despite having neck surgery.[218]  Additionally, plaintiff did not follow Dr. Hanspal's recommendation to undergo physical therapy.[219]

Inconsistencies in plaintiff's testimony also influenced the ALJ's credibility determination.  The ALJ states "[a] review of the medical evidence . . . fails to substantiate claimant's allegation that he has had three to ten medical appointments per week since 2012."[220]  Therefore, the ALJ posits, this would not affect plaintiff's ability to work on a continuous basis.[221]  Plaintiff's representations of his fear of going out in public and in or near large crowds were unpersuasive to the ALJ because plaintiff stated he went out to eat a lot, and frequently helped his father with his appointments.[222]  The ALJ also found plaintiff's testimony not credible because he stated he did not enjoy watching television since it is usually negative, but enjoys action-packed, violent shows

---

[215] *Id.*; *see* D.I. 6-13 at 709-12.
[216] D.I. 6-5 at 196.
[217] *Id.* at 193.
[218] *Id.* at 194-95; D.I. 6-17 at 1075; D.I. 6-12 at 658.
[219] D.I. 6-5 at 195.
[220] *Id.* at 196.
[221] *Id.*
[222] *Id.*; D.I. 6-16 at 924.

the most.[223]  Lastly, the ALJ explicitly states:  "I also do not find credible the claimant's testimony that the National Guard allowed him to just show up and not drill."[224]

Consistent with the ALJ's duties as outlined above, this court finds the ALJ properly followed the procedural requirements in assessing plaintiff's credibility.  This court defers to the ALJ's finding of plaintiff's credibility.[225]

## V. CONCLUSION

For the foregoing reasons, I recommend that:

(1) Plaintiff's motion for summary judgment (D.I. 11) be DENIED; and

(2) Defendant's motion for summary judgment (D.I. 15) be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  Objections and responses are limited to ten (10) pages each.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: June 30, 2017                                    /s/ Mary Pat Thynge
                                                       United States Magistrate Judge

---

[223] D.I. 6-5 at 196.
[224] *Id.* at 197.
[225] *Metz v. Fed. Mine Safety and Health Review Com'n*, 532 F. App'x 309, 312 (3d Cir. 2013) ("Overturning an ALJ's credibility determination is an "extraordinary step," as credibility determinations are entitled to a great deal of deference.").

29